Case No. 22-1858

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

AMORY INVESTMENTS LLC, *et al.*,

*Plaintiffs - Appellants,*

v.

UTRECHT-AMERICA HOLDINGS, INC., *et al.*,

*Defendants - Appellees.*

Appeal from the United States District Court
For the Northern District of Illinois, No. 1:16-cv-08637
The Honorable Thomas M. Durkin, Judge Presiding.

**BRIEF OF DEFENDANTS-APPELLEES
UTRECHT-AMERICA HOLDINGS, INC., UTRECHT-AMERICA FINANCE CO.,
RABO AGRIFINANCE LLC, RABOBANK USA FINANCIAL CORPORATION, and
COOPERATIEVE RABOBANK, U.A., NEW YORK BRANCH**

David J. Doyle
Jill C. Anderson
Matthew T. Connelly
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000

*Attorneys for Defendants-Appellees*

**ORAL ARGUMENT REQUESTED**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1858

Short Caption: Amory Investments LLC, et al. v. Utrecht-America Holdings, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Utrecht-America Holdings, Inc., Rabo AgriFinance LLC, Rabobank USA Financial Corporation, Utrecht-America

Finance Co., and Cooperatieve Rabobank, U.A., New York Branch

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freeborn & Peters LLP

(3)   If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

        See Appendix A

     ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        No publicly held company owns more than 10% of any of these parties.

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _David J Doyle_        Date: May 18, 2022

Attorney's Printed Name: David J. Doyle

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✔   No ☐

Address: 311 S. Wacker Drive, Suite 3000

Chicago, IL 60606

Phone Number: 312-360-6824        Fax Number: 312-360-6520

E-Mail Address: ddoyle@freeborn.com

rev. 12/19 AK

## Appendix A

Utrecht-America Holdings, Inc. is a wholly owned subsidiary of Rabobank International Holding, B.V.

Rabo AgriFinance LLC is a limited liability company with a single member, Utrecht-America Holdings, Inc.

Rabobank USA Financial Corporation no longer exists as a corporate entity, having been dissolved as of September 11, 2015.

Utrecht-America Finance Co. is a wholly owned subsidiary of UtrechtAmerica Holdings, Inc.

Defendant Coöperatieve Rabobank, U.A., New York Branch has no parent corporation.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1858

Short Caption: Amory Investments LLC, et al. v. Utrecht-America Holdings, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Utrecht-America Holdings, Inc., Rabo AgriFinance LLC, Rabobank USA Financial Corporation, Utrecht-America

Finance Co., and Cooperatieve Rabobank, U.A., New York Branch

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freeborn & Peters LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

See Appendix A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No publicly held company owns more than 10% of any of these parties.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jill C. Anderson     Date: June 03, 2022

Attorney's Printed Name: Jill C. Anderson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✓   No ☐

Address: 311 S. Wacker Drive, Suite 3000

Chicago, IL 60606

Phone Number: 312-360-6527     Fax Number: 312-360-6520

E-Mail Address: janderson@freeborn.com

rev. 12/19 AK

## Appendix A

Utrecht-America Holdings, Inc. is a wholly owned subsidiary of Rabobank International Holding, B.V.

Rabo AgriFinance LLC is a limited liability company with a single member, Utrecht-America Holdings, Inc.

Rabobank USA Financial Corporation no longer exists as a corporate entity, having been dissolved as of September 11, 2015.

Utrecht-America Finance Co. is a wholly owned subsidiary of UtrechtAmerica Holdings, Inc.

Defendant Coöperatieve Rabobank, U.A., New York Branch has no parent corporation

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-1858

Short Caption: Amory Investments LLC, et al. v. Utrecht-America Holdings, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Utrecht-America Holdings, Inc., Rabo AgriFinance LLC, Rabobank USA Financial Corporation, Utrecht-America

Finance Co., and Cooperatieve Rabobank, U.A., New York Branch

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freeborn & Peters LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

See Appendix A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No publicly held company owns more than 10% of any of these parties.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _Matthew Connelly_    Date: June 6, 2022

Attorney's Printed Name: Matthew T. Connelly

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 311 S. Wacker Drive, Suite 3000

Chicago, IL 60606

Phone Number: 312-360-6534      Fax Number: 312-360-6520

E-Mail Address: mconnelly@freeborn.com

rev. 12/19 AK

## Appendix A

Utrecht-America Holdings, Inc. is a wholly owned subsidiary of Rabobank International Holding, B.V.

Rabo AgriFinance LLC is a limited liability company with a single member, Utrecht-America Holdings, Inc.

Rabobank USA Financial Corporation no longer exists as a corporate entity, having been dissolved as of September 11, 2015.

Utrecht-America Finance Co. is a wholly owned subsidiary of UtrechtAmerica Holdings, Inc.

Defendant Coöperatieve Rabobank, U.A., New York Branch has no parent corporation.

## <u>TABLE OF CONTENTS</u>

Page

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT CONCERNING ORAL ARGUMENT ................................. 1

STATEMENT OF THE ISSUE ....................................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

I.     Introduction ............................................................................................2

II.    The Underlying Litigation ...................................................................2

III.   A Small Percentage of Direct Action Plaintiffs Add Rabobank as a Defendant ................3

IV.   The Allegations against Agri Stats ....................................................4

V.    The District Court Grants Rabobank's First Motion to Dismiss .........................5

VI.   The District Court Grants Rabobank's Second Motion to Dismiss....................7

SUMMARY OF THE ARGUMENT ........................................................... 10

ARGUMENT ................................................................................................. 11

I.     Introduction...........................................................................................11

II.    Legal Standards....................................................................................12

     A.    To State a Section 1 Claim, a Plaintiff Must Allege that the Defendant Knew of, and Agreed to Participate in, an Antitrust Conspiracy ................................... 12

     B.    Factual Allegations that Are Equally Consistent with Innocent Behavior and Involvement in a Conspiracy Are Insufficient to State a Claim .......................... 13

     C.    In Analyzing Whether a Plaintiff Has Adequately Stated a Claim against a Particular Defendant, the Court Should Disregard Conclusory Allegations ........ 14

III.   The District Court Properly Held that the DAPs Failed to Plausibly Allege an Antitrust Claim Against Rabobank.................................................14

     A.    The District Court Did Not Dismiss the Claims against Rabobank Simply Because Rabobank is Not a Chicken Producer..................................... 15

          1.    The district court did not state or suggest that it believed only chicken producers could be liable for participating in the alleged conspiracy .......15

2.     The district court supported its ruling with proper legal authority and did not establish a heightened pleading standard for claims against industry outsiders ............................................................................................20

B.     The District Court Did Not Subject the DAPs' Allegations to a Higher Pleading Standard Because They Sued Rabobank After Years of Discovery ...... 22

C.     The District Court Correctly Held that the DAPs' Factual Allegations Do Not Permit an Inference that Rabobank Agreed to Join, and Participated in, a Supply-Reduction Conspiracy ............................................................................ 24

1.     Rabobank's involvement in a conspiracy cannot be inferred from allegations that it encouraged chicken producers to cut supply ................24

2.     Rabobank's involvement in a conspiracy cannot be inferred from allegations that it engaged in other communications about supply cuts ....29

3.     Rabobank's involvement in a conspiracy cannot be inferred from allegations that it communicated with poultry company executives ........31

4.     Rabobank's involvement in a conspiracy cannot be inferred from allegations that it communicated with Sue Trudell....................................33

5.     Rabobank's involvement in a conspiracy cannot be inferred from allegations about its financial ties to the poultry industry ........................35

6.     Rabobank's involvement in a conspiracy cannot be inferred from allegations about its communications with poultry companies about whether it could continue to support them ..................................................36

D.     Because One Cannot Infer from Any of the DAPs' Allegations that Rabobank Agreed to Join a Conspiracy, the DAPs' Request that Their Allegations Be Viewed "Holistically" Is Unavailing ................................................................ 38

CONCLUSION ............................................................................................................ 39

CERTIFICATE OF COMPLIANCE ........................................................................... 40

CERTIFICATE OF SERVICE .................................................................................... 41

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE(S)**

*Alarm Detection Sys., Inc. v. Village of Schaumburg,*
930 F.3d 812 (7th Cir. 2019) ..................................................................................13

*Always Towing & Recovery, Inc., v. City of Milwaukee,*
2 F.4th 695 (7th Cir. 2021) ...................................................................................12

*American Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n,*
633 F. Supp. 201 (N.D. Ill. 1986) .........................................................................38

*Ashcroft v. Iqbal,*
555 U.S. 662 (2009).................................................................................6, 13, 14

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties,*
15 F.4th 831 (7th Cir. 2021) .................................................................................14

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties,*
2020 WL 5642941 (N.D. Ill. Sept. 22, 2020) .......................................................25

*Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,*
459 U.S. 519 (1983)..............................................................................................36

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................12, 13

*Blue Shield of Virginia v. McCready,*
457 U.S. 465 (1982)..............................................................................................18

*Concord Assocs., L.P. v. Ent. Properties Tr.,*
2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014).........................................................36

*Glassman v. Computervision Corp.,*
90 F.3d 617 (1st Cir. 1996).............................................................................22, 23

*Hackman v. Dickerson Realtors, Inc.,*
557 F. Supp. 2d 938 (N.D. Ill. 2008)....................................................................25

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.,*
60 F. Supp. 3d 914 (N.D. Ill. 2014) ......................................................................32

*In re Domestic Drywall Antitrust Litig.,*
163 F. Supp. 3d 175 (E.D. Pa. 2016) ....................................................................18

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.,*
28 F.4th 42 (9th Cir. 2022) ...................................................................................33

iii

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)......................................................................17, 20

*In re Local TV Advertising Antitrust Litig.*,
2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ......................................18, 19

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ..............................................................33

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011) ................................................17, 20

*In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp. 2d 799 (D. Md. 2013) ....................................................18

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ............................6, 11, 25, 38

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) .........................................12, 13, 25

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ...............................................................12

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).................................................................................31

*McCoy v. Gamesa Tech. Corp.*,
2012 WL 4481452 (N.D. Ill. Sept. 26, 2012) ...................................12

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984).................................................................................12

*Moore v. Boating Indus. Ass'ns*,
819 F.2d 693 (7th Cir. 1987) ...............................................................33

*Mueller v. Apple Leisure Corp.*,
880 F.3d 890 (7th Cir. 2018) .................................................................4

*Serfecz v. Jewel Food Stores*,
67 F.3d 591 (7th Cir. 1995) ..........................................................35, 36

*Smithkline Beecham Corp. v. Eastern Applicators, Inc.*,
2002 WL 1197763 (E.D. Pa. May 24, 2002)......................................17

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
376 F.3d 1065 (11th Cir. 2004) ...........................................................17

*Taha v. Int'l. Bhd. of Teamsters, Local 781*,
947 F.3d 464 (7th Cir. 2020) ..................................................14

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................................................19

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
679 F. Supp. 2d 1120 (C.D. Cal. 2009) .............................17, 20

*U.S. ex rel. Osheroff v. Humana Inc.*,
776 F.3d 805 (11th Cir. 2015) ...............................................27

*United States v. Andreas*,
39 F. Supp. 2d 1048 (N.D. Ill. 1998) .................................27, 28

*United States v. Apple*,
791 F.3d 290 (2d Cir. 2015).................................16, 20, 27, 28

*United States v. Gasoline Retailers Assoc., Inc.*,
285 F.2d 688 (7th Cir. 1961) .................................................17

*United States v. MMR Corp. (LA)*,
907 F.2d 489 (5th Cir. 1990) .................................................17

*Yeftich v. Navistar, Inc.*,
722 F.3d 911 (7th Cir. 2013) .................................................23

## RULES

FED. R. CIV. P. 8(a)(2)............................................................13

CIRCUIT RULE 30(b)(1) ............................................................5

## OTHER AUTHORITIES

Andy Johns, *U.S. poultry producers plucked by China's charges on imports*,
Chattanooga Times, Oct. 7. 2010, 2010 WLNR 19989793....................27

Bob Burgdorfer, *ANALYSIS – Troubles still loom for U.S. chicken industry*,
Reuters News, Aug. 8, 2008, available in Westlaw News database........................27

David Koenig, *Poultry producer to close NC plant, put 830 out of work*,
Associated Press, March 12, 2008, available in Westlaw News database........................26, 27

Julie Schmit, *No. 1 chicken producer Pilgrim's Pride files for Chapter 11*,
USA Today, Dec. 2, 2008, 2008 WLNR 23056335 ........................27

*The Troubling Mathematics of the Chicken Business*, Investopedia Stock
Analysis, Sept. 12, 2011, 2011 WLNR 28012843.................................26

## JURISDICTIONAL STATEMENT

The bases for the district court's jurisdiction and the Court of Appeals' jurisdiction set forth in the separately filed Amended Jurisdictional Statement of Appellants Amory Investments LLC, Campbell Soup Company, Campbell Soup Supply Company, L.L.C., John Soules Foods, Inc., John Soules Acquisitions, LLC, Sysco Corporation, Target Corporation, and US Foods, Inc. (collectively, the "DAPs")[1] (Doc. 26) is complete and correct.

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Circuit Rule 34(f), Rabobank respectfully requests that the Court grant oral argument to assist the Court in adjudicating this appeal.

## STATEMENT OF THE ISSUE

Whether the district court correctly ruled that the DAPs failed to plausibly allege that Rabobank knew about, and participated in, an eleven-year conspiracy to reduce the supply of broiler chickens where the only alleged misconduct attributed to Rabobank was encouraging chicken producers to cut supply.

---

[1] The abbreviation "DAPs" stands for "Direct Action Plaintiffs." Although more than 150 direct action plaintiffs filed actions in the district court against various defendants, only a small subset of those plaintiffs sued Rabobank, and an even smaller subset pursued this appeal.

## STATEMENT OF THE CASE

### I.    Introduction

Rabobank is not a chicken producer. It is a bank that provides lending and other banking services to clients in numerous industries, including the poultry industry.

Nonetheless, approximately five years into a massive antitrust case involving the supply of broiler chickens, a small number of direct action plaintiffs filed an amended complaint naming Rabobank as a defendant. These plaintiffs based their claims against Rabobank solely on documents produced in discovery and excerpts from the deposition of a Rabobank executive. Despite their attempt to put a nefarious spin on Rabobank's conduct, the allegations against Rabobank were entirely consistent with the lawful activities of a bank that had poultry company clients and realized—like so many professors, pundits, and industry observers at the time—that the industry was suffering from an over-supply of broiler chickens. The district court therefore granted Rabobank's motion to dismiss on June 1, 2021, but gave the DAPs leave to amend their allegations. On February 11, 2022, the court dismissed the amended claims against Rabobank with prejudice, finding that the allegations still were deficient as a matter of law. This appeal followed.

### II.    The Underlying Litigation

The underlying antitrust litigation in the district court before the Honorable Thomas M. Durkin has been pending since September 2016 and is a consolidated proceeding involving numerous class and individual actions brought by direct action plaintiffs, direct purchaser plaintiffs, end-user consumer plaintiffs, and commercial and institutional indirect purchaser plaintiffs ("CIIPPs"). The claims are directed at every major chicken producer in the United States and one non-producer, Agri Stats. The gravamen of the claims is that "America's chicken producers reached illegal agreements" to restrain trade from at least 2008 through 2019 by reducing the supply of broiler chickens in order to increase their price. (ECF No. 4244 ¶ 1.)

Discovery has been ongoing for years, and the parties have exchanged tens of millions of documents and taken hundreds of depositions. Among those deposed were two Rabobank employees, Adriaan Weststrate and Micki Donegan, who were involved in the bank's relationships with poultry clients during the relevant time period.

### III.     A Small Percentage of Direct Action Plaintiffs Add Rabobank as a Defendant

On January 29, 2021, after the broiler chicken litigation had been pending for almost five years, certain direct action plaintiffs filed an Amended Consolidated Complaint that named four Rabobank entities as defendants for the first time.[2] (ECF No. 4244 ¶ 240.) No class claims have been brought against Rabobank, and Rabobank was not sued by any of the direct purchaser plaintiffs, end-user consumer plaintiffs, or CIIPPs. In addition, only a small minority of direct action plaintiffs alleged claims against Rabobank in the amended complaint. (*See id.* at 3-52 (listing 151 direct action plaintiffs, 26 of which filed claims against Rabobank).)

Despite the voluminous discovery the plaintiffs had taken by January 2021, their 425-page complaint devoted only 13 of its 1,514 paragraphs to allegations against Rabobank. (*Id.* ¶¶ 574-86.) In these thirteen paragraphs, the plaintiffs quoted eleven emails, two slide presentations, and two excerpts from Mr. Weststrate's deposition that supposedly showed that Rabobank had joined a chicken conspiracy. (*Id.*) These documents and excerpts fell into four categories: (1) internal Rabobank communications commenting on the chicken industry's supply; (2) email exchanges between a Rabobank employee and one of the bank's consultants about whether cutbacks in the chicken industry were occurring; (3) email exchanges between a Rabobank employee and

---

[2] Those entities are: (1) Utrecht-America Holdings, Inc.; (2) Rabo AgriFinance LLC; (3) Rabobank USA Financial Corporation; and (4) Utrecht-America Finance Co. When the DAPs amended their claims against Rabobank several months later, they added a fifth Rabobank entity as a defendant— Cooperatieve Rabobank, U.A., New York Branch.

individual poultry clients about "production discipline"; and (4) presentations at industry meetings that allegedly encouraged cutbacks in production. (*Id*.).

Rabobank attached all of these documents as exhibits to its initial motion to dismiss.[3] These documents—whether viewed individually or collectively—do not show that Rabobank had any knowledge of an alleged supply-reduction conspiracy by U.S. chicken producers, or that Rabobank agreed to play a role in such a conspiracy. According to the plaintiffs, by 2008, "the oversupply and low prices of chickens put [chicken producers] in dire financial straits." (ECF No. 4244 ¶ 341.) As the "leading lender and financial institution serving the poultry industry," Rabobank obviously did not want to see the broiler producers who "turned to Rabobank for credit and/or transactional work" fail. (*Id.* ¶ 574.) But, as a bank, Rabobank had no ability to set the price of broiler chickens and did not benefit from any specific increase or decrease in price. Moreover, Rabobank did not publicly disseminate any unique information about the broiler chicken industry, and there would have been no reason for chicken producers to consult Rabobank about how to implement an industrywide conspiracy to restrict output. Indeed, plaintiffs do not allege otherwise.

## IV.  **The Allegations against Agri Stats**

Aside from Rabobank, the only other non-chicken producer named as a defendant in the entire litigation is a consulting firm, Agri Stats. According to the plaintiffs, Agri Stats gathered "specific, competitively-sensitive information" from chicken producers and disseminated this information in a "detailed, readily-decipherable form" that allowed producers to see "financial, production, breeder flock size and age, capacity, cost, and numerous other categories of

---

[3] The district court properly reviewed these documents—which were referenced in the DAPS' complaints and formed the underlying factual basis for their claims—under the "well-settled" and "liberal" rule in this Circuit that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (citing cases).

information by each chicken producer on a weekly and monthly basis." (ECF No. 4244 ¶¶ 938-39, 943-44.) Agri Stats moved to dismiss the claims against it, but the district court denied that motion because the plaintiffs had identified Agri Stats as "a tool Defendants used to help implement their conspiracy." (ECF No. 541 at 44.)

The plaintiffs made no similar allegations against Rabobank. They did not, for example, allege that Rabobank sent chicken producers confidential information that was used to further the alleged conspiracy. To the contrary, the DAPs concede that "only Agri Stats" had that information. (ECF No. 4244 ¶ 937.) The information Rabobank possessed regarding the broiler chicken industry came from the same public sources available to every other industry outsider. (*See id.* (alleging that "[t]he USDA and various other entities publicly published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry").)

## V.     The District Court Grants Rabobank's First Motion to Dismiss

In moving to dismiss the claims against it, Rabobank argued that the allegations were insufficient to show that Rabobank had agreed to participate in an antitrust conspiracy. (ECF Nos. 4369-4372.) The district court agreed, dismissing the claims against Rabobank and explaining that Rule 12(b)(6) "does not permit Plaintiffs to chase ghosts." (6/01/21 Order at SA2.) The court conducted a detailed analysis of the DAPs' allegations against Rabobank and explained why they failed to state a plausible claim.[4]

---

[4] Despite Circuit Rule 30(b)(1)'s requirement that the DAPs include in the appendix "[c]opies of any other opinions, orders, or oral rulings in the case that address the issues sought to be raised," the DAPs did not include the district court's June 1, 2021 dismissal order in their appendix. Rabobank, therefore, has included this order in its Supplemental Appendix. In this brief, references to the DAPs' Appendix are designated "A[page number]," references to Rabobank's Supplemental Appendix are designated "SA[page number]," and references to the DAPs' appellate brief are designated "Br. at [page number]."

First, the court examined the allegations that Rabobank had frequent communications with major companies in the poultry industry. (*Id*.) The court reasoned that the "mere possibility that the subject matter of Rabobank's communications was the alleged conspiracy to reduce supply is insufficient to state a claim." (*Id*. (citing *Ashcroft v. Iqbal*, 555 U.S. 662, 678 (2009)).) The court further noted that the emails the DAPs cited to support their allegations were "entirely ambiguous as to the subject matter of the communications they reference," and that "Plaintiffs are asking the Court to infer that Rabobank knew about and communicated with Defendants about the alleged conspiracy from the unsurprising and unsuspicious fact that Rabobank communicated with Defendants." (*Id*. at SA3.) The court concluded that there were "too many inferences in that chain of reasoning for it to retain plausibility." (*Id.*)

Second, the court found "even less compelling" the DAPs' allegations that Rabobank "campaigned for the industry to reduce production in order to increase [the] prices" of broiler chickens. (*Id*.) As the court reasoned, "[y]ou don't need to be John Maynard Keynes to recognize this truism, and simply repeating it without a plausible claim of helping the producers to coordinate production decreases does not an antitrust violation make. Encouraging lower production by itself is simply not enough to plausibly establish liability." (*Id*. at SA3-SA4 (citing *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 841 (N.D. Ill. 2017).)

Third, the court examined the allegations that Rabobank had communicated with individuals at Agri Stats regarding the need for production cuts. (*Id*. at SA4.) Like Rabobank's communications with its poultry company clients, the court found that these communications were insufficient to link Rabobank to an antitrust conspiracy because they "merely establish that Rabobank had a significant interest in the industry" and did not show that Rabobank was "involved in coordinating production cuts among the producers." (*Id*.)

Fourth, the court reasoned that the DAPs' allegations against Rabobank were "all the more insufficient when viewed in the context of the complaint as a whole." (*Id.*) In contrast to the "great detail" the plaintiffs had provided about the supply of chicken during the relevant time period and the activities of the other defendants, the DAPs "dedicate only 13 of 1,514 paragraphs to Rabobank's conduct," and the "most compelling allegations against Rabobank are based on three emails, which … are ambiguous at best." (*Id.*)

Finally, the court distinguished the allegations against Rabobank from the allegations against the only other non-producer defendant, Agri Stats. The court explained that the "allegations against Agri Stats were much more concrete" because plaintiffs alleged that Agri Stats generated reports about the producers that, "are so detailed that ... Defendants were able to use the reports to communicate their Broiler production intentions." (*Id.* at SA3.) Further, "since Agri Stats produced the reports, the Court found it plausible that Agri Stats knew the reports were being used to facilitate the conspiracy." (*Id.*) In contrast, there was "no similar factual basis regarding Rabobank's communications with Defendants from which the Court can infer that those communications concerned the alleged supply reduction conspiracy." (*Id.*)

The district court therefore dismissed the claims against Rabobank without prejudice, stating: "If Plaintiffs discover facts plausibly implicating Rabobank in the conspiracy, Plaintiffs may amend their complaint." (*Id.* at SA4-SA5.)

## VI.    The District Court Grants Rabobank's Second Motion to Dismiss

The DAPs did not "discover" anything new. Nonetheless, a month later, on June 30, 2021, eight DAPs filed Second Amended Complaints containing revised allegations against Rabobank.[5]

---

[5] These eight DAPs—Amory Investments LLC, Campbell Soup Company, Campbell Soup Supply Company, John Soules Foods, Inc., John Soules Acquisitions LLC, Target Corporation, Sysco Corporation, and US Foods, Inc.—are the appellants here. No other plaintiffs elected to file amended complaints against Rabobank following the district court's dismissal.

(*See* ECF Nos. 4799, 4801, 4803, 4805, 4807, and 4809). All of these complaints—filed by the same law firm—contain identical allegations and increased the number of paragraphs directed at Rabobank from 13 to 38.

The new complaints cite documents and deposition testimony the DAPs had possessed for years. Most of these documents were produced by Rabobank in October 2018 or March 2019, and the cited deposition testimony of Rabobank employee Adriaan Weststrate was from a deposition taken on June 19, 2019. The new paragraphs that supposedly detail Rabobank's involvement in a chicken conspiracy fall into five categories: (1) evidence of Rabobank's encouragement to the chicken industry to reduce supply; (2) evidence of Rabobank's financial interest in the chicken industry; (3) messaging by Rabobank that it could become difficult to finance the chicken industry absent "reforms"; (4) communications about production cuts; and (5) allegations about this litigation and whether Rabobank sought antitrust advice. (*See* A17-A21 ¶¶ 5-8, 10-16, 18-23, 28-30, 35-36.) The DAPs' new complaints also included most of the same allegations from their first complaint that were deemed insufficient to state a claim, either repeated verbatim or with minor, insignificant revisions. (*See* A17-A20 ¶¶ 4, 9, 17, 24-27, and 31-34.)

Because the amended allegations against Rabobank suffered from the same defects as the original allegations, Rabobank again moved to dismiss. (ECF Nos. 4874-4876.) And, once again, the district court granted Rabobank's motion. In doing so, the district court found that none of the new allegations in the amended complaints "changes the Court's perspective that Rabobank's liability is not plausible." (*See* 2/11/22 Order at A2.) Once again, the court distinguished the allegations against Rabobank from the allegations against the many producer defendants whose dispositive motions were denied: "Plaintiffs cannot allege that Rabobank directly caused the production decrease, because of course Rabobank is not a producer." (*Id.*) Because the DAPs

sought to pursue an antitrust claim against Rabobank under the theory that it "served as a communications conduit between the producers," the DAPs' "allegations of communication must be strong." (*Id.* at A2-A3.) Yet, as the district court found, "the allegations of Rabobank's communications are weaker than the alleged communications among the producer-defendants." (*Id.* at A3.)

> Elaborating on this observation, the court reasoned:

> Rabobank is alleged merely to have internally discussed the need for production cuts in the industry and to have repeatedly urged producers to cut production so as to increase price. Such advice is to be expected from an industry financer. It is an obvious statement of the law of supply and demand, and is also entirely in Rabobank's self-interest. It is not suspicious, and does not permit the inference that Rabobank was communicating information between the producer-defendants. Rabobank's statements that the industry should cut production are simply not plausible evidence of conspiracy when coming from a financial institution concerned with its bottom line with respect to the Broiler industry, as opposed to being a participant in the market.

(*Id.*)

The district court reiterated that, in its initial dismissal order, it found that the communications between Rabobank and chicken-producer defendants were "entirely ambiguous." (*Id.*) To state a plausible claim, the DAPs "needed to have identified more instances of such communication in circumstances indicating that confidential information was conveyed." (*Id.*) But the DAPs' allegations merely showed "that Rabobank had a close relationship with some of the defendants." (*Id.*)

Finally, the court again rejected the DAPs' contention that its allegations against Rabobank were "akin to" the plaintiffs' allegations against Agri Stats. As the court noted, "all defendant-producers subscribed to Agri Stats, whereas only a few defendants were Rabobank clients." (*Id.* at A4.) Further, "the allegations were strong that Agri Stats revealed purportedly confidential information. As discussed, there are no comparably strong allegations that Rabobank served as a

communications conduit." (*Id.*) The Court therefore granted Rabobank's motion to dismiss with prejudice. (*Id.*)

Thereafter, the DAPs filed a motion seeking leave to file an interlocutory appeal under Rule 54(b), which the district court granted, and this appeal followed.

## SUMMARY OF THE ARGUMENT

The DAPs offer this Court no basis for reversing the sound decision of the district court. In an attempt to distort the record on appeal, the DAPs accuse the district court of deviating from the well-known standards governing the pleading of antitrust conspiracy claims articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). According to the DAPs, the district court held their allegations to a higher standard than Rule 8 requires because Rabobank is not a chicken producer and because the DAPs had the benefit of years of discovery before adding Rabobank as a defendant.

The court did no such thing. Its conclusion that the DAPs failed to plausibly allege that Rabobank joined the alleged conspiracy is grounded squarely in controlling law. The district court properly recognized that where allegations of conspiracy are just as consistent with lawful conduct as they are with collusion, the plaintiff has failed to state a claim. And, here, looking beyond the conclusory allegations in the Second Amended Complaints, the DAPs' allegations fail to identify any facts from which one could infer that Rabobank agreed to join a sprawling, eleven-year conspiracy to restrict the output of broiler chickens with twenty chicken producers, many of which never had a relationship with Rabobank. At most, the DAPs' factual allegations show that Rabobank encouraged supply cuts and hoped they would occur. Because encouragement and wishful thinking are not enough to plausibly tie a defendant to an antitrust conspiracy, this Court should affirm the district court's dismissal of the claims against Rabobank.

# ARGUMENT

## I.    Introduction

To state a claim against Rabobank under Section 1 of the Sherman Act, the DAPs were required to allege that Rabobank had knowledge of the alleged conspiracy, was aware of its scope, agreed to play a defined role in it, and made good on that agreement by furthering the conspiracy in some meaningful way. The DAPs' allegations do not plausibly show *any* of these things. They do not establish that Rabobank knew about an industrywide conspiracy, had input into specific broiler reductions or pricing, controlled any of the chicken producers, benefitted when broiler prices rose or fell, or was even needed for the alleged conspiracy to function as desired by the companies that supposedly implemented it.

Instead, a fair reading of the allegations—when viewed in a light most favorable to the DAPs—shows that Rabobank monitored activity in the chicken industry and periodically made the commonsense observation that the industry as a whole would benefit from reducing supply. This type of encouragement is not actionable; it is Economics 101. As a senior judge in the Northern District of Illinois once observed: "[T]here is a trade-off between price and volume. If firms want to raise prices, they have to produce less, sell less, and thereby say 'no' to customers. It should not be a mark of conspiracy to say what is true, already known by the audience, and articulated by countless third-party analysts, academicians, and jurists alike." *Kleen Prods. LLC v. International Paper*, 276 F. Supp. 3d 811, 841 (N.D. Ill. 2017) (Leinenweber, J.).

These observations apply here. Rabobank's only alleged participation in the purported conspiracy was to make obvious statements derived from economic truths about the broiler chicken market. These statements did not enhance the conspirators' ability to enter into a scheme to reduce output, and they mirrored those of myriad other market observers and industry outsiders. Because the DAPs failed to plausibly allege that Rabobank knew about the alleged conspiracy, agreed to

11

play a role in it, or participated in it in any way, the district court properly dismissed the DAPs'

Section 1 Sherman Act and related state-law claims against Rabobank.

## II.    Legal Standards

### A.    To State a Section 1 Claim, a Plaintiff Must Allege that the Defendant Knew of, and Agreed to Participate in, an Antitrust Conspiracy

To plead that a defendant was part of an antitrust conspiracy, a plaintiff must allege facts

sufficient to establish that the defendant knew of the conspiracy and agreed to join it—*i.e.*, that the

defendant had a "conscious commitment to a common scheme designed to achieve an unlawful

objective." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 343 (7th Cir.

2022) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (affirming

dismissal of antitrust claim where plaintiff did not allege defendants "knew of any conspiracy,

much less shared an intent to participate in one")). As the Supreme Court has explained, "stating

[a Section 1 claim] requires a complaint with enough factual matter (taken as true) to suggest that

an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Always

Towing & Recovery, Inc., v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) ("*Twombly*

requires that the existence of an agreement that violates § 1 of the Sherman Act 'be pleaded

plausible through allegations of fact.'").

In addition, a plaintiff must plead that the defendant participated in the alleged conspiracy

by playing a defined role. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832,

843 (7th Cir. 2020) (affirming dismissal where plaintiffs failed to plead defendant distributors

"played any role" in alleged price fixing conspiracy); *see also McCoy v. Gamesa Tech. Corp.*, No.

11 C 592, 2012 WL 4481452, at *5 (N.D. Ill. Sept. 26, 2012) (dismissing antitrust complaint where

plaintiff "failed to make a threshold showing that [defendant] participated in an unlawful

conspiracy"), *aff'd sub nom. McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674 (7th Cir. 2014).

**B.     Factual Allegations that Are Equally Consistent with Innocent Behavior and Involvement in a Conspiracy Are Insufficient to State a Claim**

Critical to this appeal, where the conduct alleged is equally consistent with independent lawful behavior as it is with unlawful collusive behavior, a plaintiff has failed to "nudge[] their claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570. Indeed, "*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest." *Marion Diagnostic Ctr.*, 29 F.4th at 351. In addition, the facts alleged must establish a "reasonable inference" that a defendant knowingly agreed to engage in an antitrust conspiracy; they cannot require the court to make a "speculative leap" that such an agreement was made. *See Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827-28 (7th Cir. 2019) (affirming dismissal of antitrust claim where facts alleged were as consistent with lawful behavior as with an agreement to engage in an antitrust conspiracy).

In other words, the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 555 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to show "that the pleader is entitled to relief." *Id.*; FED R. CIV. P. 8(a)(2).

**C.      In Analyzing Whether a Plaintiff Has Adequately Stated a Claim against a Particular Defendant, the Court Should Disregard Conclusory Allegations**

Finally, the law is well settled that "[m]ere legal conclusions ... are 'not entitled to be assumed true' at the pleading stage." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021) (citing *Iqbal*, 556 U.S. at 681) (rejecting allegations that the defendant "agreed," "conspired," "colluded," or "induced" "agreement, conspiracy, or collusion"). In analyzing the sufficiency of a complaint, courts should reject "sheer speculation, bald assertions, and unsupported conclusory statements." *Taha v. Int'l. Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). Complying with this standard is particularly important in antitrust cases to avoid "the potentially enormous expense of discovery in cases with no reasonably founded hope" of success. *Ass'n of Am. Physicians & Surgeons*, 15 F.4th at 834 ("*Twombly* bars [a] discover-first, plead-later approach … [f]or good reason: modern antitrust litigation is expensive").

**III.      The District Court Properly Held that the DAPs Failed to Plausibly Allege an Antitrust Claim against Rabobank**

The district court correctly found that the DAPs' allegations are insufficient to state a Section 1 claim against Rabobank. Simply put, the DAPs failed to allege facts showing that Rabobank knew about, or agreed to play a role in, a conspiracy to restrict the output of broiler chickens. At most, the DAPs' allegations suggest that Rabobank encouraged certain chicken producers to restrict production, which the district court rightly found to be "unsurprising," "unsuspicious," and "entirely in Rabobank's self-interest."  (6/01/21 Order at SA3; 2/11/22 Order at A3.)

The DAPs' arguments on appeal can be distilled to three primary contentions: (1) the district court placed undue reliance on the fact that Rabobank is not a chicken producer; (2) the district court improperly subjected the DAPs' allegations to a heightened pleading standard

because the claims against Rabobank were filed following years of discovery; and (3) the DAPs' allegations plausibly allege that Rabobank assented to, and participated in, the alleged antitrust conspiracy. As explained below, the DAPs are wrong on all three counts.

### A. The District Court Did Not Dismiss the Claims Against Rabobank Simply Because Rabobank is Not a Chicken Producer

#### 1. The district court did not state or suggest that it believed only chicken producers could be liable for participating in the alleged conspiracy

The DAPs devote almost half of their argument section to building up a straw man and knocking it down. They posit that the district court "start[ed] from the premise that it is generally implausible for a third party to conspire with a group of horizontal competitors who make or sell a product the third party does not." (Br. at 11; *see also id.* at 14-15 (stating that the district court "presume[d] wrongly that third party involvement in a conspiracy is novel or implausible absent some extraordinary showing").) After staking out this position, the DAPs devote several pages and a dozen case citations to arguing that non-market participants can be liable under Section 1 of the Sherman Act. (*Id.* at 11-17.)

The district court, however, never stated or suggested otherwise. To the contrary, the court made clear that it does not believe industry outsiders like Rabobank are entitled to special protection against Section 1 liability. In its order dismissing the initial claims against Rabobank, Judge Durkin stated: "If allegations plausibly demonstrate that a banker, lender, accountant, lawyer, or other service provider facilitated an unlawful conspiracy among their clients, the Court does not perceive any precedential danger in holding that person accountable for their conduct. The force of the allegations controls the analysis, not the title of the potential defendant." (6/01/21 Order at SA5.) The DAPs ignore this passage entirely.

They also ignore that, earlier in this case, the district court denied the motion to dismiss filed by the only other non-producer defendant, Agri Stats. (*See* ECF No. 1943.) The fact that the

court allowed the claims against this non-market participant to proceed shows that the court understood that non-market participants can be liable under Section 1. The reason that Rabobank prevailed on its motion to dismiss and Agri Stats did not had nothing to do with the type of entities they are, or the industries in which they operate. Rather, it is because the plaintiffs alleged concrete details about Agri Stats' alleged role as a conduit for information that supposedly facilitated the alleged conspiracy, and the DAPs made no such allegations about Rabobank. Indeed, the DAPs failed to allege that Rabobank provided *any* meaningful information to chicken producers, or that Rabobank performed *any* function that was essential to the alleged conspiracy. In short, the district court's ruling was not the product of a misunderstanding that Rabobank's status as a bank somehow shields it from liability.

Moreover, the cases the DAPs cite in which courts ruled that third parties could be liable for facilitating an antitrust conspiracy are easily distinguished from this one. For example, the DAPs rely heavily on a case involving Apple's efforts to wrest ebook sales away from Amazon. (*See* Br. at 13 (citing *United States v. Apple*, 791 F.3d 290 (2d Cir. 2015).) There, although Apple was not one of the book publishers that engaged in price fixing, it devised the contractual mechanism by which the conspiracy was implemented and personally profited from it by stealing market share from a competitor. *Apple*, 791 F.3. at 296-98. Here, in contrast, there are no allegations that Rabobank devised *anything* or that it gained a competitive advantage from any chicken producer's decision to reduce supply.

In addition to *Apple*, the DAPs cite eleven cases for the proposition that industry outsiders can conspire with horizontal competitors. (Br. at 11-14.) In one of these cases, in the context of analyzing an alleged conspiracy to monopolize under Section 2, the Eleventh Circuit actually affirmed the dismissal of antitrust claims and made the non-controversial observation that

conspiracies need not be "limited solely to market participants." *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1078 n.10 (11th Cir. 2004). No monopolization claim is at issue here.

In the DAPs' other cases, the non-market participant was alleged to be a critical player in the conspiracy without which the conspiracy could not have occurred. Indeed, in several instances, the industry outsider was the mastermind behind the illegal arrangement. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 337, 344 (3d Cir. 2010) (identifying insurance broker as the "mastermind" that "instigated, coordinated, and policed" the conspiracy); *United States v. MMR Corp. (LA)*, 907 F.2d 489, 496-98 (5th Cir. 1990) (affirming criminal conviction against supposed non-competitor that actively participated in bid-rigging scheme by agreeing not to bid on construction project in exchange for multi-million-dollar subcontract); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 (N.D. Ill. 2011) (denying motion to dismiss where trade association allegedly facilitated supply-reduction conspiracy by falsely denying the existence of supply shortages and lying to a government agency); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1134-36 (C.D. Cal. 2009) (denying motion to dismiss where non-market participant was one of two members in the alleged conspiracy and allegedly furthered it by lying to customers and altering images of sponsored athletes to remove competitors' logos); *Smithkline Beecham Corp. v. Eastern Applicators, Inc.*, No. CIV.A. 99-CV-6552, 2002 WL 1197763, at *8 (E.D. Pa. May 24, 2002) (allowing bid-rigging claims to proceed against non-market participant that allegedly oversaw the construction project at issue and managed the bidding process); *United States v. Gasoline Retailers Assoc., Inc.*, 285 F.2d 688, 689-90 (7th Cir. 1961) (affirming Section 1 conviction against labor union that facilitated gas price conspiracy by entering into contracts that precluded competition and by punishing non-compliance

by picketing gas stations and halting delivery of gasoline); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 469 (1982) (allowing Section 1 claim to proceed against insurer that furthered conspiracy to restrain competition in psychotherapy market by refusing to reimburse patients for treatment by psychologists but reimbursing comparable treatment by psychiatrists).

Two of the DAPs' cases consider whether a non-market participant can facilitate a price-fixing conspiracy by disseminating information to the alleged price fixers. *See In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175 (E.D. Pa. 2016); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799 (D. Md. 2013). Notably, in a recent case from the Northern District of Illinois, the court distinguished these cases, endorsed the ruling of the district court in *this* case, and dismissed antitrust allegations far stronger than the allegations against Rabobank. *See In re Local TV Advertising Antitrust Litig.*, No. 18 C 6785, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022).

In *Local TV*, the plaintiffs alleged the existence of a conspiracy to raise the prices of broadcast television spot advertisements by agreeing to fix prices and exchange sales data. *Id.* at *1. The defendants included broadcast companies, like CBS and Fox, and a non-broadcaster— ShareBuilders—that certain defendants had retained to assist with inventory management and pricing. *Id.* at *2. The plaintiffs alleged that the price fixing was facilitated largely through a reciprocal exchange of confidential information, including the market analyses and pricing information ShareBuilders provided. *Id.* at *2-3.

In granting ShareBuilders' motion to dismiss, the court acknowledged that "conduits of information may face Section 1 liability under certain circumstances." *Id.* at *4. It then discussed Judge Durkin's rulings in the broiler chicken litigation and the fact that he found the allegations against Agri Stats to be sufficient to state a claim, whereas the allegations against Rabobank were not because there needed to be "more specific allegations that Rabobank's communications to the

other defendants were in some way unlawful." *Id.* at *5-6. Agreeing with Judge Durkin's analysis, the *Local TV* court explained that "to plausibly infer that a defendant *facilitated* a conspiracy [as a communications conduit], plaintiffs must allege facts showing that the conduit's circulation of information enabled co-conspirators to tacitly communicate with one another." *Id.* at *6.

Turning to the allegations against ShareBuilders, the court found that although the company sent detailed "holding capacity information," "custom station reports," and weekly pricing recommendations to its broadcaster clients, the plaintiffs had failed to allege that ShareBuilders knew of, and facilitated, a price-fixing conspiracy. *Id.* As the court explained:

> Plaintiffs' charge falls short of plausibly alleging that ShareBuilders facilitated underlying misconduct as a conduit of communication, in the vein of Agri Stats in the *Broiler Chicken Litigation.* Specifically, they fail to allege that ShareBuilders' analytics were presented with so much specificity that the Broadcaster Defendants could use them to "police a secret or tacit conspiracy to [fix] prices."

*Id.* (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001)).

As noted above, the allegations against ShareBuilders were much stronger than the allegations against Rabobank here. Among other things, the plaintiffs in *Local TV* alleged that ShareBuilders sent weekly pricing information to the supposed price fixers. The DAPs' complaints do not identify *any* information Rabobank supposedly supplied to chicken producers that facilitated the alleged conspiracy. Citing allegations in paragraph 31, the DAPs argue that Rabobank was a communications conduit that "conveyed, and facilitated the conveyance of, confidential information between and among producers." (Br. at 16 n.10, 25.) That paragraph, however, does not identify any confidential information Rabobank purportedly supplied; rather, as discussed *infra* in Section III.C.3, it merely cites snippets from emails between Rabobank and two poultry company executives that, on their face, have nothing to do with broiler chickens.

In the end, the DAPs' reliance on case law involving third parties and non-market participants is unavailing. The DAPs did not allege that Rabobank devised the alleged conspiracy or profited from it like the defendants in *Apple* and *In re Insurance Brokerage*. They did not allege that Rabobank lied to anyone to facilitate the conspiracy like the defendants in *In re Plasma* and *Warnaco Swimwear.* And they did not allege that Rabobank was a conduit for information that facilitated the alleged conspiracy, as they alleged with respect to Agri Stats. As the district court ruled, and as Rabobank argued below, "[i]t is not Rabobank's status as an industry outsider that requires dismissal. It is the fact that the allegations against it are deficient as a matter of law." (ECF No. 4536 at 5.)

2. **The district court supported its ruling with proper legal authority and did not establish a heightened pleading standard for claims against industry outsiders**

The DAPs further criticize the district court by arguing that: (1) the court's "failure to cite any cases in its dismissal order makes it difficult to discern what decisional law, if any, informed its decision"; and (2) the court improperly applied a heightened pleading standard to the DAPs' claims by stating that the allegations against Rabobank "must be strong." (Br. at 11.) Both criticisms miss the mark.

First, it is unfair for the DAPs to chide the district court for not citing "any cases in its dismissal order." (*Id.*) Before the court ruled on Rabobank's motions to dismiss, it issued four rulings on motions to dismiss filed by other defendants. (*See* ECF Nos. 541, 1943, 3519 & 3704.) The first of these rulings resolved motions brought by numerous chicken-producer defendants. (ECF No. 541.) The opinion spanned 92 pages and was richly supported by citations to controlling law. When the court ruled on Rabobank's first motion to dismiss, it referenced this lengthy ruling and also cited *Iqbal* in articulating the proper pleading standard. (6/01/21 Order at SA2-SA3.) To

20

be sure, the court's opinion granting Rabobank's second motion to dismiss is concise, but this is unsurprising given the DAPs' failure to improve upon allegations the court previously found deficient. There was no need for the court to rehash its prior articulations of the relevant pleading standards, and it is poor form for the DAPs to feign "difficult[y] … discern[ing]" the legal standards the district court applied to Rabobank's motion.

Second, it is misleading for the DAPs to argue that because the district court said the allegations against Rabobank "must be strong" (Br. at 11), the court imposed a higher pleading standard than Rule 8 requires. Contrary to the DAPs' argument, Judge Durkin did *not* state that the allegations against Rabobank needed to meet some heightened measure of "strength." Instead, the court explained that the allegations of *communication* between Rabobank and chicken producers needed to be strong because the DAPs could not (and did not) allege that Rabobank engaged in parallel conduct with producers. As the district court reasoned:

> The plausibility of the claims against the producer defendants is founded on the fact that they are the producers of the relevant product. They directly control the means of production, and production materially decreased during the relevant time period. The allegations in the class complaints of collusive communication among the producers was not particularly strong. But in the context of the unusual supply decrease, and other market facts, a conspiracy was plausibly alleged.
>
> By contrast, Plaintiffs cannot allege that Rabobank directly caused the production decrease, because of course Rabobank is not a producer. Rather, Plaintiffs allege that Rabobank served as a communications conduit between the producers for purposes of effectuating the conspiracy. To plausibly allege Rabobank served as a communications conduit, *the allegations of communication must be strong*. But the allegations of Rabobank's communications are weaker than the allegations of communications among the producer defendants.

(2/11/22 Order at A2-A3 (emphasis added).)

As this passage demonstrates, the district court did not suggest that the pleading standard for industry outsiders is different from the standard that applies to insiders. Instead, the court merely observed that Rabobank cannot be tied to the alleged conspiracy in the same way a chicken

producer can because Rabobank did not control the means of production. Because the sole theory against Rabobank is that it facilitated the alleged conspiracy through its communications with chicken producers, it follows that the evidence that Rabobank engaged in improper communications with producers must be significant. Yet, after examining the DAPs' allegations, the court correctly found that they were devoid of *any* communications suggesting that Rabobank facilitated the alleged conspiracy. Thus, the DAPs failed to state a claim.

### B.     The District Court Did Not Subject the DAPs' Allegations to a Higher Pleading Standard Because They Sued Rabobank After Years of Discovery

The DAPs argue that there is a second reason why the district court "subjected the Rabobank DAPs to an improper, heightened pleading standard"—namely, because "extensive discovery [had] taken place." (Br. at 26-27.) But once again, nowhere in the district court's ruling did it suggest that it was applying a more exacting pleading standard to the DAPs' allegations because the DAPs waited until the litigation was almost five years old to add Rabobank as a defendant. To the contrary, the court's motion to dismiss rulings properly cite cases like *Twombly* and *Iqbal* and reflect a firm grasp of the law applicable to antitrust allegations.

But even if the court *had* applied additional scrutiny to the DAPs' allegations due to the procedural posture of the case, this would have been proper. As the Supreme Court has advised, determining whether allegations satisfy the plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 555 U.S. at 679. Both experience and common sense tell us that allegations made after years of discovery should be stronger and more detailed than allegations made without the benefit of any discovery at all. Indeed, the First Circuit has explicitly recognized this fact and observed that when a case "comes to us after over three years of litigation," it is appropriate to "look more closely at

the factual allegations to see if they support the legal conclusions pled." *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996).

*Glassman* speaks to the true significance of the fact that the DAPs sued Rabobank so late in the game. It is not that some new or different pleading standard applies to their allegations— and, again, there is no indication that Judge Durkin *applied* such a standard. But in situations like this, where the plaintiffs' allegations are informed by hundreds of depositions and millions of documents produced during years of discovery, courts should look closely at the factual allegations to make sure they support the legal conclusions pled. The DAPs concede that they initially viewed Rabobank as an "innocent bystander" and only decided to sue Rabobank because of what they supposedly learned "during discovery." (Br. at 4.) As a result, all of the allegations against Rabobank are grounded in evidence that can be examined by a reviewing court.

The Supreme Court's instruction in *Iqbal* to ignore buzzwords and conclusions in analyzing the sufficiency of allegations applies in all federal cases, but it is particularly appropriate here, where a court can look beyond the DAPs' conclusions and examine the *sources* of their allegations. The district court did exactly that. Thus, for example, it did not credit allegations that Rabobank "facilitated and participated in coordination to achieve supply cuts" (*see* A14 ¶ 9), or that Rabobank "worked hand in hand … with producers … to manipulate prices of broilers" (A17 ¶ 24), because these are "conclusory factual allegations" that courts "need not accept as true." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). Instead, the court examined the emails and other documents cited in the DAPs' allegations and concluded that the documents did not allow an inference that Rabobank agreed to join a massive conspiracy to restrict the output of broiler chickens. Instead, the documents merely showed that Rabobank "internally discussed the need for production cuts in the industry and … repeatedly urged producers to cut production so as

to increase price." (2/11/22 Order at A3.) This does not plausibly suggest that Rabobank acted unlawfully. To the contrary, "[s]uch advice is to be expected from an industry financer." (*Id.*)

Rabobank respectfully asks this Court to apply the same scrutiny to the DAPs' allegations and affirm the sound ruling of the district court.

### C. The District Court Correctly Held that the DAPs' Factual Allegations Do Not Permit an Inference that Rabobank Agreed to Join, and Participated in, a Supply-Reduction Conspiracy

The district court correctly ruled that the DAPs' allegations fail to state a claim. To assist the Court in evaluating that ruling, Rabobank includes in its separately filed Supplemental Appendix the key documents upon which the DAPs' allegations are based, so that the Court can review them free from the DAPs' spin, just as the district court did. Rabobank discusses each of these documents in the argument below, which is admittedly detailed, but necessarily so. When one looks beyond the DAPs' conclusory allegations and examines the *source* of those allegations, it becomes clear that the district court's decision to dismiss the claims against Rabobank was correct.

#### 1. Rabobank's involvement in a conspiracy cannot be inferred from allegations that it encouraged chicken producers to cut supply

Several of the DAPs' allegations concern Rabobank's supposed encouragement to the chicken industry to reduce the supply of broiler chickens. (*See* A14-A17 ¶¶ 10-11, 16, and 22.) The DAPs place particular emphasis on two emails from February 2011 in which Rabobank's Adriaan Weststrate references preaching the "gospel" to chicken companies. (Br. at 21-22.) In the first, Weststrate thanks Jim Perdue of Perdue Farms for an invitation to attend a board meeting and states, in part: "You can count on us to help you in any way possible to get through this down cycle, including preaching the gospel to other poultry companies." (Ex. 1 at SA8.) In the second, Weststrate tells Bill Lovette of Pilgrim's: "I think we will see some 'shake-up' in the industry this

year unless we suddenly get some price increases in BSMB and corn comes down. Both are unfortunately unlikely so we are left with the old 'production cuts' gospel!!" (Ex. 2 at SA11).[6]

Neither of these emails suggests that Rabobank agreed to participate in an output-reduction conspiracy. As the district court correctly held, the fact that Rabobank "campaigned for the industry to reduce production in order to increase prices" was entirely consistent with the lawful activities of a bank that had loaned significant sums of money to its poultry clients. (6/01/21 Order at SA3.) "Encouraging lower production" is simply not enough to plausibly state a Section 1 claim. *Id.*; *see also Marion Diagnostic Ctr.*, 29 F.4th at 350 (affirming dismissal where steps defendants took to "encourage providers to buy [certain] products" were just as consistent with lawful activity as they were with engaging in an antitrust conspiracy); *Kleen Prods.,* 276 F. Supp. 3d at 841 (N.D. Ill. 2017) ("It should not be a mark of conspiracy to say what is true, already known by the audience, and articulated by countless third-party analysts, academicians, and jurists alike"); *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 946 (N.D. Ill. 2008) (granting dismissal because "encouragement absent agreement is not enough" to state a Section 1 claim); *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-cv-02795, 2020 WL 5642941, at *9 (N.D. Ill. Sept. 22, 2020) (dismissing Section 1 claim and explaining that "[e]ncouraging and campaigning ... are not the same as a conspiracy").

This makes perfect sense. There is a vast difference between *preaching* supply restraint and entering into an illegal agreement with others to *implement* it through collusive behavior. One cannot infer the latter from the former. In fact, if anything, the subject emails show Rabobank's *lack* of involvement in a conspiracy because Weststrate would not have felt the need to urge

---

[6] The reference to "BSMB" in this email likely was a typographical error. Weststrate undoubtedly meant to write "BSBM," which is an acronym for boneless, skinless breast meat.

producers to make production cuts if Rabobank already had joined an industrywide agreement to facilitate such cuts through concerted action.

The DAPs' other encouragement allegations fare no better. In paragraph 16, they cite an internal Rabobank email from October 2011 in which Weststrate comments on bird weights and writes that he is: "planning o[n] sending a very 'stern' message to all poultry companies." (Ex. 3 at SA14.) The content of this anticipated "message" (and whether it was delivered) is unclear, but even if the email reflects Rabobank's desire to encourage supply restraint among chicken producers, such encouragement is not actionable.

Similarly, the selective quotes from Weststrate's deposition in paragraph 22—*e.g.*, that Rabobank had conversations with its poultry clients about "the need for the industry to [] cut back production"—do not suggest that Rabobank knew about or participated in a conspiracy to restrict the output of broilers. Rather, they merely show that Rabobank had an interest in the financial performance of the industry as a financer of chicken companies, and that Rabobank was hoping that the industry would begin acting in its economic self-interest.

As the district court correctly found, the market observations attributed to Rabobank in the DAPs' complaints were both sensible and unremarkable. The fact that supply had outpaced demand for broilers at certain points between 2008 and 2019, and that producers could combat the negative impact of this surplus by reducing supply, was a conclusion any first-year economics student could have reached. Indeed, many market observers were proclaiming openly the same thing Rabobank was telling its clients: "Simply put, there's just too much chicken out there."[7]

---

[7] *The Troubling Mathematics of the Chicken Business*, Investopedia Stock Analysis, Sept. 12, 2011, 2011 WLNR 28012843; *see also id.* ("The first resolution is to do nothing and continue to take losses. The second potential resolution is to cut production – less volume, but hopefully at higher per-piece prices; and more importantly, at a level that can produce profits again."); David Koenig, *Poultry producer to close NC plant, put 830 out of work*, March 12, 2008, available in

The DAPs offer three arguments on the subject of encouragement, none of which is persuasive. First, they claim that they alleged "more than mere encouragement"—*i.e.*, they pled that "Rabobank intentionally and actively participated in an anticompetitive scheme with the other Defendants." (Br. at 24.) But this is true only if one improperly accepts the complaint's conclusory allegations. None of the DAPs' *factual* allegations shows that Rabobank knew of the alleged conspiracy, devised any facet of the scheme, shared confidential information with chicken producers, coordinated supply cuts, lied to regulators, engaged in a cover up, or was even needed for the alleged conspiracy to function as planned.

Second, the DAPs argue that encouragement *can* support a Section 1 claim when it is "part of the concerted action." (Br. at 24.) To support this proposition, they cite decisions from two criminal cases, *United States v. Apple*, discussed *supra* in Section III.A.1, and *United States v. Andreas*, 39 F. Supp. 2d 1048 (N.D. Ill. 1998), in which the courts refer briefly to acts of encouragement by the defendants. But in both cases, the evidence showed that the defendants not only encouraged the illegal behavior but were its ringleaders. In *Apple*, the defendant devised the

---

Westlaw News database (reporting that analyst at financial services firm "said in a note to clients that production cuts are needed to improve the industry's fundamentals, and that the cuts announced Wednesday were 'a start but it is not enough to turn around the industry'"); Bob Burgdorfer, *ANALYSIS – Troubles still loom for U.S. chicken industry*, Reuters News, Aug. 8, 2008, available in Westlaw News database (reporting that "the industry is still producing too many chickens" and quoting agriculture advisory firm analyst as stating that egg sets "need to be 5 to 7-1/2 percent lower"); Julie Schmit, *No. 1 chicken producer Pilgrim's Pride files for Chapter 11*, USA Today, Dec. 2, 2008, 2008 WLNR 23056335 (reporting opinion of JP Morgan analyst that chicken industry "cuts were likely" and that "a steep reduction would help the 'downtrodden industry' lift prices"); Andy Johns, *U.S. poultry producers plucked by China's charges on imports*, Chattanooga Times, Oct. 7. 2010, available at 2010 WLNR 19989793 (quoting University of Georgia professor of poultry sciences as stating that, in the near term, as a result of "basic laws of supply and demand," poultry farmers "will end up having to cut back"). The district court was entitled to take judicial notice of these articles and the fact that these statements were made. *See, e.g.*, *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811-12 (11th Cir. 2015) (holding district court properly took judicial notice of several newspaper articles in analyzing motion to dismiss).

anticompetitive agreements that were at the heart of the conspiracy. And in *Andreas*, "recorded conversations and co-conspirator testimony established that the defendants did, in fact, … agree to set the price of lysine" and then "concealed their scheme with sham meetings propped up by phony agendas while secretly haggling over price." 39 F. Supp. 2d at 1063. In short, *Apple* and *Andreas* do not support the DAPs' argument that mere encouragement can support a Section 1 claim.

Third, the DAPs argue that "dismissing [the gospel] emails as mere encouragement violates the requirement that all reasonable inferences be drawn in plaintiffs' favor." (Br. at 24.) But the inferences the DAPs ask this Court to draw are not "reasonable." Indeed, the DAPs fail to cite any decision in the post-*Twombly* era in which a court inferred from similar communications that a defendant had joined an antitrust conspiracy. In reality, it is the DAPs that are seeking to diverge from controlling law by asking this Court to find that factual allegations that do not show *any* awareness of a conspiracy on the part of Rabobank and are *entirely* consistent with Rabobank acting in its lawful self-interest cross the line from conceivable to plausible.

Finally, the DAPs criticize the district court's attention to detail, arguing that its "failure" to explicitly discuss the gospel emails "should cast serious doubt on the soundness of the District Court's conclusion that Section 1 against Rabobank is implausible." (Br. at 23.) The court, however, plainly reviewed the DAPs' amended allegations and concluded that there was nothing new of import. (*See* 2/11/22 Order at A2 ("Plaintiffs make additional allegations in their amended complaint, *all of which the Court presumes to be true*, but nothing that changes the Court's perspective that Rabobank's liability is not plausible") (emphasis added).) The problem with the DAPs' encouragement allegations is *not* that the court failed to consider them; it is that they fail to show that Rabobank knew about or facilitated the alleged conspiracy.

### 2.     Rabobank's involvement in a conspiracy cannot be inferred from allegations that it engaged in other communications about supply cuts

In addition to the encouragement emails, the DAPs argue that Rabobank's alleged participation in a conspiracy can be inferred from documents evidencing *other* communications regarding supply cuts to which Rabobank was a party. (*See* Br. at 25; A15-A19 ¶¶ 12, 18, 21, and 28-30.) This is not so.

For the Court's convenience, Rabobank has included all seven of these supply-cut documents in its Supplemental Appendix. (*See* Exs. 4-10 at SA16-SA85.) One cannot infer the existence of a chicken conspiracy—or Rabobank's participation in such a conspiracy—from any of them. For example, the document cited in paragraph 12 is a March 2011 email from Sue Trudell of Agri Stats to four Rabobank employees that states: "After weeks of talking about possible cutbacks, we are seeing some declines in average liveweights and lower slaughter in some weight classes and regions." (Ex. 4 at SA17). Trudell does not attribute these declines to anything that Rabobank did or to concerted action on the part of chicken producers. Rather, she speculates that the "mild drop in production" is the result of two factors: (1) some producers scaling back production due to high costs and losses; and (2) the outbreak of a winter viral disease. (*Id.*). Nothing about this email suggests that Rabobank was involved in an output-reduction conspiracy.

The remaining documents are similarly innocuous. In the email cited in paragraph 18, Weststrate reports to other Rabobank employees that market data shows "progress in the production cutbacks in the US Poultry Industry." (Ex. 5 at SA25.) Far from suggesting Rabobank's involvement in a chicken conspiracy, this is exactly the type of internal report one would expect to see from a bank that is monitoring industry activity. In the email cited in paragraph 21, Weststrate forwards to colleagues at Rabobank information received from a third-party market analyst, Informa Economics. (Ex. 6 at SA29.) His cover email contains the following sentence

quoted in the DAPs' complaints: "Production is under control with more reductions to come." (*Id.*) But, once again, there is nothing nefarious or incriminating about this observation. Weststrate is merely summarizing information in "the attached Informa Weekly Poultry Outlook." (*Id.*)

Finally, the documents cited in paragraphs 28-30 do not implicate Rabobank in a chicken conspiracy. The DAPs' citation to Exhibit 7 is curious, as this internal Rabobank email shows that Rabobank did not receive Agri Stats' monthly reports containing the non-public information that supposedly facilitated the alleged conspiracy. (Ex. 7 at SA53.) This email only serves to underscore Rabobank's inability to control broiler production or pricing.

Exhibit 8 is a September 2008 email from an employee of Fieldale Farms to two Rabobank employees that states, in part: "We are taking a 2nd reduction of 2.5% head. 7.5% overall reduction fur [sic] our company in 2008. Others in the industry will follow." (Ex. 8 at SA57). Discussions like this between Rabobank and its poultry clients do not suggest that Rabobank joined an output-reduction conspiracy. They merely show that Rabobank talked to its clients about their business.

Exhibit 9 is an internal Rabobank memorandum from October 2008 that discusses the confluence of events that caused the "deteriorating financial situation in the U.S. Poultry Industry." (Ex. 9 at SA59, SA61). In paragraph 29, the DAPs selectively quote the memo at page 15: "The industry is finally starting to react with real production cuts." (A18-A19.) But this is only part of the sentence. The full sentence reads: "The industry is finally starting to react with real production cuts *forecast by EMI Analytics* at 5% in Q4/08 and 4% in Q1/09." (Ex. 9 at SA73 (emphasis added).) In other words, the memo simply conveys industry projections Rabobank had obtained from a third-party market analyst. It does not suggest that Rabobank joined a supply conspiracy.

Finally, Exhibit 10 is a January 2009 email from Sue Trudell to Weststrate in which Trudell writes that she is "increasingly optimistic" that 2009 "will be better than 2008 for all of us who

care about poultry." (Ex. 10 at SA84). Later in the email, she states: "The models look much more positive, now that Russia is settled and the production cuts are holding." (*Id.*) Trudell also states: "I take constant complaints [from second stage processors] about short supplies and higher prices as a good indicator that the reduction in chicken production is working." (*Id.*) As with the other emails discussed above, the references to production cuts may show Rabobank's interest in the poultry industry, but they do not allow an inference that Rabobank joined a decade-long conspiracy with twenty chicken producers to restrict the output of broiler chickens.

### 3. Rabobank's involvement in a conspiracy cannot be inferred from allegations that it communicated with poultry company executives

The amended complaints also contain allegations of additional communications between Rabobank and poultry company executives that the DAPs argue support an inference of conspiracy. (*See* A19-A20 ¶¶ 31-34.) They do nothing of the sort.

For example, two emails cited in paragraph 31 reference a dinner between Weststrate and the CEO of Perdue and a phone conversation between the CEOs of Perdue and Pilgrim's Pride (Exs. 11-12, SA86-89.) The emails refer to Pilgrim's having an "interest" in something and to Perdue "getting their house in order," but they do not mention chicken, broilers, supply restrictions, or pricing. (Ex. 12 at SA89.) The district court correctly found these emails to be "entirely ambiguous as to the subject matter of the communications they reference." (6/01/21 Order at SA2-SA3.) As a result, they do not suggest that Rabobank joined a chicken conspiracy. And while the DAPs argue that evidence of an agreement to join a conspiracy may include "ambiguous statements" (Br. at 9), antitrust law "limits the range of permissible inferences from ambiguous evidence," such that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986). With respect to these emails, the parties

could have been discussing any number of topics unrelated to the supply of broiler chickens. There is no reason to link these communications to an industrywide chicken conspiracy. *See In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 958 n.33 (N.D. Ill. 2014) ("The decision by a group of industry players to have a meeting or to talk at a dinner or cocktail reception does not constitute a conspiracy."), *aff'd*, 801 F.3d 758 (7th Cir. 2015).

The same is true of the documents cited in paragraph 32. The first is a transcript from a June 21, 2011 earnings call during which, among many other comments, the CEO of Pilgrim's Pride predicted that the industry "will produce less chicken." (A19-A20 ¶ 32; Ex. 13 at SA95.) The second is an email that Weststrate sent to Pilgrim's CEO and another executive the next day, congratulating them on "getting the amendment done" and stating: "Stock up 15% - we should ask [Pilgrim's CEO] to talk more often about the industry!!" (A19-A20 ¶ 32; Ex. 13 at SA100.) Nothing about these documents suggests Rabobank's knowledge of an industrywide conspiracy.

In paragraph 33, the DAPs cite a September 2011 email that Weststrate sent to another poultry company executive in which Weststrate wrote: "If you don't mind I would like to follow up with you re a meeting of stakeholders to brainstorm about ways to improve the way the industry prices it[s] products." (A20 ¶ 33; Ex. 15 at SA102.) There is nothing nefarious about a bank and its client discussing the client's business practices. Moreover, it is not even clear that Weststrate wanted to discuss broiler prices, as opposed to the pricing of other products, and the DAPs do not allege that the brainstorming session referenced in this email actually occurred.

In paragraph 34, the DAPs cite a number of documents to support their allegation that Rabobank called for "discipline" in industry presentations and reports to broiler producers. For example, they quote a slide deck Weststrate prepared for a presentation at the 2008 National Chicken Council Winter Meeting that includes a single slide on the U.S. poultry industry

containing a bullet that reads: "Production discipline is paramount." (Ex. 16 at SA128.)  They also

cite a November 2011 email suggesting that Weststrate was considering recommending in a report

to Rabobank's clients that the industry make a "7-8 percent cut-back on production." (Ex. 17 at

SA132-SA133.)

Courts long have held that these types of industry communications do not suggest that the

speaker has joined a conspiracy. *See, e.g., Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th

Cir. 1987) ("[M]ere membership in a trade association, attendance at trade association meetings

and participation in trade association activities are not, in and of themselves, condemned or even

discouraged by the antitrust laws.") (citation omitted); *In re Musical Instruments & Equip.

Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[M]ere participation in trade-organization

meetings where information is exchanged and strategies are advocated does not suggest an illegal

agreement."); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,

28 F.4th 42, 52 (9th Cir. 2022) ("[w]e have recognized that 'trade associations often serve

legitimate functions,' and courts are reluctant to infer conspiracy from '[g]athering information

about pricing and competition in the industry' at such meetings.").

### 4.      Rabobank's involvement in a conspiracy cannot be inferred from allegations that it communicated with Sue Trudell

The DAPs place considerable emphasis on Rabobank's relationship with Sue Trudell, an

employee of defendant Agri Stats, claiming that Rabobank's hiring of her as a consultant shows

"that Rabobank was participating in the conspiracy during 2008 and 2009." (Br. at 19-20.) Once

again, however, none of Rabobank's communications with Trudell show that it agreed to join, or

participated in, the alleged conspiracy.

For example, in the August 2008 emails quoted in paragraphs 25 and 26, Weststrate and

Trudell discuss the need for production cuts in the chicken industry. In the first, Weststrate laments

the producers' lack of urgency in cutting production and asks to schedule a call with Trudell to discuss "what we can do to make sure the industry 'gets it.'" (A17-18 ¶ 25; Ex. 18 at SA136.) In the second, Weststrate writes to Trudell, "[i]t still doesn't look like we are getting some 'real' cutbacks," and Trudell responds, in part, by saying, "I hope the producers got the message to cut!" (A12 ¶ 26; Ex. 19 at SA139.)

These emails do not show Rabobank's knowledge of an alleged, industrywide conspiracy to restrict broiler output. In fact, they show just the opposite. If Rabobank had joined a conspiracy with producers to restrict output, the content of the emails would have been very different—*e.g.*, "why hasn't producer X implemented the cutbacks we agreed upon?" Nothing in the emails suggests that Rabobank joined, or wished to join, a supply-reduction conspiracy with twenty chicken producers.

The DAPs' citation to the document quoted in paragraph 26 is disingenuous. They use this email to support the allegation that "Weststrate worked hand in hand with Trudell for years—and with producers—to fix prices of broilers." (A17 ¶ 24.) As noted above, the Supreme Court has directed courts to ignore conclusory allegations like this and to examine the facts cited to support them. *See Twombly*, 550 U.S. at 557. Here, the "support" is an email in which Weststrate tells Trudell: "The main question we need to answer is whether, how and when we feel the industry will start to show improving results and start being profitable again (2010?). We need to buil[d] a case here." (Ex. 20 at SA141.) The DAPs imply that this email is evidence of Rabobank "building a case" for chicken producers to reduce output. A review of the email, however, shows that Weststrate wanted to "build a case" about the long-term viability of the poultry industry for a presentation to the "senior credit people" at Rabobank. (*Id.*)

34

In short, nothing in Weststrate's email exchanges with Trudell suggests that Rabobank knew about, agreed to join, or facilitated a conspiracy to restrict the supply of broiler chickens.

### 5.    Rabobank's involvement in a conspiracy cannot be inferred from allegations about its financial ties to the poultry industry

Five of the paragraphs in the Second Amended Complaints concern Rabobank's financial connection to the poultry industry. (*See* A13-A14 ¶¶ 4-8.) The DAPs argue that these allegations demonstrate that Rabobank had a motive to participate in the alleged conspiracy and, therefore, they support the inference that Rabobank did so. (Br. at 18-19.) They do not.

In these paragraphs, the DAPs allege that Rabobank is the leading lender to the poultry industry (A12 ¶ 4); that Rabobank would have lost money if broiler producers had not cut production in 2008 (*id.* ¶ 5); that as of May 2009 Rabobank had loaned $1.95 billion to its poultry clients, and $560 million was outstanding (*id.* ¶ 6); that Weststrate wrote in an August 2014 email that "Perdue represents one of Rabobank's largest exposures…." (*id.* ¶ 7);[8] and that, in addition to lending services, Rabobank offers its poultry clients merger and acquisition-related services (*id.* ¶ 8). One cannot infer from any of these allegations that Rabobank knew about, or agreed to facilitate, a wide-ranging conspiracy to reduce the supply of broiler chickens. To the contrary, these allegations explain why Rabobank had a perfectly lawful interest in monitoring the poultry industry and providing fiscal advice to its poultry clients.

In addition, as this Court has recognized, "[a]lthough a lack of motive may be evidence that parties did not conspire, the presence of an economic motive is of very little probative value."

---

[8] In an attempt to play up Rabobank's financial exposure to the poultry industry, the DAPs alter the meaning of the quoted sentence in this email by using ellipses. The sentence reads in full: "Perdue represents one of Rabobank's largest exposures, including the SIP Facility, *in the US Poultry industry* and we were very disappointed that the Shared National Credit (SNC) again classified Perdue as 'Substandard' in their last review this past May." (Ex. 21 at SA145 (emphasis added).)

*Serfecz v. Jewel Food Stores*, 67 F.3d 591, 600-01 (7th Cir. 1995) (explaining that "[t]he mere existence of mutual economic advantage … supplies no basis for inferring a conspiracy"); *see also Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 537 (1983) (stating that "an allegation of improper motive … is not a panacea that will enable any complaint to withstand a motion to dismiss"); *Concord Assocs., L.P. v. Ent. Properties Tr.*, 2014 WL 1396524, at *23-24 (S.D.N.Y. Apr. 9, 2014) (dismissing Sherman Act claim because, aside from alleging motive, plaintiff failed to allege the defendants participated in a conspiracy).

The fact that Rabobank may have wanted its poultry clients to remain in business does not mean that it shared a common motive with producers to restrict the output of broiler chickens. There are no allegations that Rabobank benefitted financially from any particular decision a producer made, and, in fact, as the leading lender to certain producers, Rabobank made more money when these companies struggled because, like all companies, they needed more financing in difficult economic times. In sum, the DAPs' motive allegations do not push their claims against Rabobank across the line from possible to plausible.

> **6.  Rabobank's involvement in a conspiracy cannot be inferred from allegations that it communicated with poultry companies about whether it could continue to support them**

Finally, five paragraphs in the Second Amended Complaints concern allegations that Rabobank communicated to the poultry industry that it might not be able to continue financing its poultry clients absent industry reforms. (*See* A15-A17 ¶¶ 14-15, 17, and 19-20). Like the allegations discussed above, these allegations do not support an inference that Rabobank was involved in an output-reduction conspiracy.

For example, in paragraph 15, the DAPs cite an October 2011 email exchange between Weststrate and an executive at Koch Foods in which the executive forwards an article about the

challenges facing the chicken industry and states: "if we as an industry can't figure it out in the next six months, I believe there is real carnage that will occur." (Ex. 22 at SA148). Weststrate responds: "I totally agree with you and can promise you that the banks are not going to be there in 6 months if this doesn't change!!" (*Id.*). Similarly, in paragraph 17, the DAPs quote an email from October 2011 in which Weststrate writes: "We need to make a statement what we think cutbacks need to be to get sustained profitability. The overall conclusion should be that the banks might not be able to continue to support an industry that is relying on the banks to keep them alive every 3 years." (Ex. 23 at SA151).

Nothing about these emails suggests that Rabobank agreed to be part of a massive conspiracy to reduce the output of broiler chickens. Indeed, if Rabobank had joined such a conspiracy, there would have been no need to author handwringing emails about the need to tell its poultry clients that its resolve to extend them credit might be wavering. Instead, Rabobank would have *known* that cuts were coming because it would have reached an agreement with its clients to achieve the unlawful purpose of collusively restricting supply.

In paragraph 19, the DAPs cite a summary apparently written by someone at Agri Stats containing "Random Thoughts" about what occurred at the January 2012 International Poultry Exposition. (Ex. 24 at SA155). Among these thoughts, the author writes that Weststrate "offer[ed] a bankers perspective on how the U.S. poultry industry responds to the challenges of higher feed prices and lower returns with cautions to the industry that it's getting more and more difficult to finance operations without some structural reform of the industry." (*Id.* at SA155-SA156). In paragraph 20, the DAPs claim that chicken producers "got the message" because a draft slide deck created by someone at Perdue in 2012 contained a slide with the title, "What banks want to hear" that states (among other things): "Cut kill,…don't increase weight." (Ex. 25 at SA161).

Once again, however, to the extent that Rabobank told poultry companies that their economic struggles were jeopardizing Rabobank's ability to continue lending them money, this is entirely consistent with a bank looking out for its own economic interests. One cannot infer from these communications that Rabobank agreed to join, and play a defined role in, a supply-reduction conspiracy.

### D. Because One Cannot Infer from Any of the DAPs' Allegations that Rabobank Agreed to Join a Conspiracy, the DAPs' Request that Their Allegations Be Viewed "Holistically" Is Unavailing

Finally, in a last-ditch attempt to convince the Court that they plausibly alleged Rabobank's involvement in an eleven-year chicken conspiracy, the DAPs argue that when the "[gospel] emails are considered, holistically, with numerous other allegations, they amply establish the sufficiency of the complaint." (Br. at 26.)

But if *none* of the DAPs' allegations is more consistent with Rabobank's involvement in a conspiracy than with lawful, non-collusive behavior, then aggregating them makes no difference. They still fail to state a claim. *See, e.g., American Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 633 F. Supp. 201, 215 n.23 (N.D. Ill. 1986) ("AFS argues it is impermissible to 'compartmentalize' the evidence in a Section 1 case…. But it requires no sophistication in mathematical theory to recognize that zero plus zero plus zero still equals zero. The Court's analysis of AFS' proffered evidence of conspiracy has not 'wiped the slate clean' after considering each incident. If no incident has probative value, all incidents together have no probative value."); *Kleen Prods.*, 276 F. Supp. 3d at 844 (holding that, after analyzing the evidence as a whole, there was insufficient evidence of an antitrust conspiracy because the defendants "have said nothing that can be reasonably construed as acknowledgment of an agreement" and their conduct was "as consistent with permissible competition as with illegal conspiracy").

38

That is exactly the case here. The district court examined the DAPs' allegations, ignored the complaints' conclusions, and correctly found that none of the facts alleged plausibly tied Rabobank to the alleged conspiracy. Taking the "holistic" approach the DAPs advocate does not help them because one still must make too many speculative leaps to conclude from their allegations that Rabobank's involvement in a conspiracy is plausible. As such, this Court should not disturb the sound decision of the district court.

## <u>CONCLUSION</u>

The district court properly applied the guidance of *Twombly* and *Iqbal* and ruled that the DAPs failed to plausibly allege that Rabobank agreed to join, or participate in, an alleged conspiracy to restrict the output of broiler chickens. For the foregoing reasons, this Court should affirm the district court's February 11, 2022 order.

Dated: October 21, 2022                    Respectfully submitted,

                                          By: /s/ *David J. Doyle*

                                          *Counsel for Defendants-Appellees Utrecht-America Holdings, Inc., Rabo AgriFinance LLC, Rabobank USA Financial Corporation, Utrecht-America Finance Co., and Cooperatieve Rabobank, U.A., New York Branch*

David J. Doyle
Jill C. Anderson
Matthew T. Connelly
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000

## **CERTIFICATE OF COMPLIANCE**

1.     This document complies with the word limit of Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,574 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with size 12 point font and Times New Roman type style.

Dated: October 21, 2022                         /s/ David J. Doyle_____
                                                                 *Attorney for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2022, the Appellees' Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 21, 2022                     /s/ David J. Doyle
                                            *Attorney for Defendants-Appellees*